(85 App. Div. 216.)

O'GARA v. ELLSWORTH et al.

(Supreme Court, Appellate Division, Third Department. June 30, 1903.)

1. DAMAGES—BREACH OF CONTRACT—MEASURE—EVIDENCE.
   The measure of damages for breach by the seller of a contract for the sale of an inferior grade of anthracite coal was the market value of that particular coal at the time and place of delivery.

2. SAME.
   If the coal could not be obtained at the place of delivery, evidence of the price of similar coal at places not distant or in other controlling markets would be proper to establish the price at the place of delivery.

3. SAME.
   The highest market price of the coal during the season would not furnish a fair measure of damages.

Appeal from Judgment on Report of Referee.

Action by Thomas J. O'Gara against Edwin H. Ellsworth and others. From a judgment for plaintiff, entered on the decision of a referee, defendants appeal. Reversed.

Argued before PARKER, P. J., and SMITH, CHASE, CHESTER, and HOUGHTON, JJ.

Owen Cassidy, for appellants.

O. P. Hurd, for respondent.

HOUGHTON, J.   The plaintiff brings this action, as assignee of the firm of O'Gara, King & Co., to recover damages against the defendants for breach of a contract alleged to have been made by them to sell to said firm 5,000 tons of Crescent coal.   During the period covered by the controversy the defendants controlled the entire output of the Crescent colliery, located in the vicinity of Coxton, Pa. The alleged contract between the defendants and the plaintiff's assignors was embraced in numerous letters, telegrams, and price-list circulars, quite ambiguous, as constituting a binding contract on the part of the defendants to sell to the plaintiff's assignors 5,000 tons of coal.   Except for the fact that the defendants interpreted the correspondence against themselves, and recognized it as constituting a contract, and did acts which might be considered a part performance, there would be a very grave question whether anything further passed between the parties than offers and counter propositions.   The referee has found, however, that there was a contract binding on the defendants, which they partly performed, and it is not our purpose in this decision to question the correctness of his conclusions in that regard.   In the further discussion of the case it will be assumed that such binding contract existed.

The delivery of the coal was, by the contract, subject to the ability of the defendants to procure cars upon which to load it.   The plaintiff claimed that the defendants made no efforts to procure cars, and that the railroads in the vicinity of the colliery had many cars available for that purpose during the time the coal should have been delivered. It was undisputed that the coal roads allowed only a certain percentage or certain kind of cars to be loaded with coal the destination of which was west of Buffalo.   The entire 5,000 tons was to be transported to Chicago and vicinity.   The defendants claimed that they were unable to procure cars for western transportation.   The contract also provided for sample cars of Crescent coal, to be approved by the purchasers.   We refrain from discussing these propositions, for an expression of opinion as to them might unnecessarily embarrass the parties on a retrial of the case, which, we think, must be ordered, because of errors committed by the referee in respect to the proof of damages which he allowed.

The contract provided that the coal should be delivered free on board the cars at the mines at $1.90 per ton for egg, stove, and nut sizes, and 15 cents less per ton for grate size.   It was undisputed that Crescent coal, which the defendants contracted to sell and deliver, was of a poor quality for anthracite coal; that it was soft, and easily broken; and that it sold in the market for a less price than some other kinds of anthracite coal.   Defendants were also dealers in Ply-

mouth coal; and, while they were quoting Crescent coal to the plaintiff's assignors at $1.90, Plymouth coal was quoted at $2.15; and, while Crescent grate was $1.90, with 15 cents off, Plymouth grate was $2. The plaintiff's assignors were dealers in coal at Chicago, and sold in that city and surrounding territory. The referee found that the market value of anthracite coal at the mines at the time of the breach of the contract was $2.75 per ton, and that the difference between the contract price and the market price was 85 cents per ton on all sizes except grate, on which it was $1 per ton. We think he erred in the admission of the evidence which permitted him to come to this conclusion. The plaintiff produced one of the employés of his assignor firm, and proved the freight rate per ton from the Crescent mine to Joliet and Chicago; and then, against the defendants' objection and exception, the referee permitted him to state the highest price of Crescent anthracite coal during the season of 1899 at Joliet, Ill. Deducting the freight from the prices given, left the coal at the mine from $2.70 for grate to $3.20 per ton for the other sizes. Another employé was produced, who was acquainted with the market value of coal at Joliet and Chicago during the time, and against like objection and exception was allowed to state the highest market price for Crescent anthracite coal during said period, and gave substantially the same prices. The plaintiff's counsel, evidently not being satisfied with this proof of market value, later in the case called a witness, who was familiar generally with the price of coal in the anthracite region, but who knew nothing of the Crescent mine, or the coal it produced; and he was asked what was the market price at the mines, of coal, in the anthracite region, during the year 1899. Against the defendants' specific objection that the plaintiff must be confined to the market price of Crescent coal, he was allowed to give the general price of coal during that period. One of the former witnesses was recalled, who had made inquiries as to the price of coal at the mines during the period, and testified that the price of Plymouth coal was $2.75 per gross ton. The referee fixed that as the price, and charged the defendants with the difference between that and the price stipulated in the contract.

The plaintiff should have confined his proof to the market price of Crescent coal; or, if the defendants controlled the output of that coal, so it could not be obtained, then to the price of coal of similar kind and quality. The plaintiff called one of the defendants as a witness, and he testified that during the entire season of 1899, the price of Crescent coal did not rise to exceed 20 cents per ton, and at times sold even lower than $1.90 per ton. The superintendent of the Crescent colliery was called by the defendants, and he testified that at all times the Crescent coal sold for from 50 to 75 cents per ton less than other coal produced in that vicinity. The damages of the plaintiff depended upon the market price at which he could have purchased the coal at the time and place of delivery. Dana v. Fiedler, 12 N. Y. 40, 62 Am. Dec. 130. If coal could not be obtained from the Crescent mine, evidence of the price of similar coal at places not distant, or in other controlling markets, would be proper, not for the purpose of establishing the market price at

another place, but for the purpose of showing the market price at the place of delivery. Cahen v. Platt, 69 N. Y. 348, 25 Am. Rep. 203. Besides, the prices given by the witnesses at Joliet and Chicago were retail prices. Market value is the price at which goods can be replaced for money in the market, not the retail price for which they are sold. Wehle v. Haviland, 69 N. Y. 448. The highest market price in the season of 1899 was not the fair measure of damage, even if it had been proper to prove the price of coal at Joliet and Chicago. Where property should have been delivered at any time within a certain period, the law, in regulating the measure of damages, contemplates a range of the entire market, and the average of prices as thus found, running through the period of time. Neither a sudden and transient inflation nor depression of prices should control the question. Smith v. Griffith, 3 Hill, 333, 38 Am. Dec. 639; Durst v. Burton, 47 N. Y. 167, 7 Am. Rep. 428. In addition, the case of Grand Tower Co. v. Phillips, 23 Wall. 471, 23 L. Ed. 71, cited by the respondent's counsel, with quite similar facts, is a direct authority against the propriety of proving the market price in the manner which was done on the trial. The Grand Tower Company was engaged in coal mining 80 miles above Cairo, on the Mississippi, and had contracted to deliver a large quantity of coal, and had failed to perform. The court held that the measure of damages was the price which the purchasers would have had to pay for coal of the same kind in the quantities in which they were entitled to receive it from the company under the contract, at the nearest available market where it could have been obtained; and that the cash value of similar coal at Cairo, or at points below it on the Mississippi river, less the cost and expenses of transporting it, was not the true measure of value.

The damages which were awarded to the plaintiff were assessed on a wholly erroneous theory, and in violation of well-settled rules, and require a reversal of the judgment.

The judgment should be reversed upon the law and the facts, referee discharged, and a new trial granted, with costs to appellant to abide the event. All concur.